## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | * | |
| v. | * | Crim. No. RDB-23-0296 |
| ERIC CHASE a/k/a David Blackwell | * | |
| *Defendant.* | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Defendant Eric Chase ("Defendant" or "Chase") is charged in a three-Count Superseding Indictment with possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841 (Count One); possession of firearm and ammunition by a prohibited person, in violation of 18 U.S.C. § 922(g)(1) (Count Two); and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count Three). (ECF No. 37 at 1–3.) These charges arose when Baltimore City Police Department officers stopped Chase on May 12, 2023, after allegedly observing him engage in a hand-to-hand drug transaction in an area known for drug-trafficking. (ECF No. 32 at 1.)

Among the motions presently pending before this Court is Defendant's Motion to Suppress Property, (ECF No. 32), ("Defendant's Motion").[1] The parties' submissions have been reviewed, and on March 25, 2025, the Court heard oral arguments regarding that

---

[1] The Court ruled on Defendant's Motion to Suppress Statements (ECF No. 33) and Defendant's Motion to Dismiss Count Two (ECF No. 31) by separate Memorandum Order (ECF No. 64). Also pending are Defendant's two Motions *in limine* (ECF Nos. 52 \*SEALED\*, 53 \*SEALED\*). These Motions *in limine* will be addressed at a later date, as discussed on the record at the March 25, 2025, Motions Hearing.

Motion.[2]  On the record at the Motions Hearing, after presentation of testimony and legal argument, the Court denied Chase's Motion to Suppress Property.  For the reasons set forth on the record and explained further below, therefore, Defendant's Motion (ECF No. 32) is DENIED.

## BACKGROUND

The charges against Chase arose during his interaction with Baltimore City Police Department ("BPD") officers in the 2000 block of Maryland Avenue in Baltimore City at approximately 1:00 in the afternoon on May 12, 2023.  (ECF No. 32 at 2; ECF No. 35 at 1.)  For nearly an hour in the early afternoon of May 12, 2023, BPD Northern District Sergeant Schreven ("Sergeant Schreven") observed Chase via Baltimore's CitiWatch camera system[3] in the 2000 block of Maryland Avenue, which is known to law enforcement as an area of frequent drug trafficking activity.  (ECF No. 32 at 2; ECF No. 35 at 1.)  Through the CitiWatch camera, Sergeant Schreven observed Chase sitting on a concrete wall with a woman in a jean jacket, Jane Doe ("Doe"), when an older woman wearing a headscarf approached Chase and Doe with her hand extended palm up.  (ECF No. 35 at 2; DX 2 at 22:32–22:56; GX 1A at 22:32–22:56.)  Doe then held a closed fist over the woman's extended palm.  (ECF No. 35 at 2.)

Based on this observation, Sergeant Schreven zoomed the camera closer and watched the older woman handle her wallet while Doe reached into her own unzipped purse.  (ECF

---

[2] At the conclusion of the hearing on March 25, 2025, and by subsequent letter order, the Court set a briefing schedule regarding Motions *in limine* and revised the pretrial conference schedule such that the pretrial conference will now take place on the record at 2:00 PM on Monday, April 7, 2025.

[3] Baltimore's CitiWatch camera system is a system of pole cameras throughout Baltimore that enables officers to observe individuals in public spaces.  As occurred in this case, officers can access the CitiWatch camera system from the police station and respond to areas throughout Baltimore based on their observations via the cameras.

No. 35 at 3; DX 2 at 22:52–23:09; GX 1A at 22:52–23:09.)  The older woman appeared to drop something, and she and Doe searched the ground.  (DX 2 at 22:52–23:09; GX 1A at 22:13–23:31.)  Doe then removed something from her purse and gave it to the older woman while Chase sat next to them watching the exchange.  (*Id.* at 23:35–23:40.)  Sergeant Schreven believed that he then observed the woman in the headscarf remove a pipe from her purse and begin to stuff it with something.  Based on his training and nine years of experience as a BPD officer, he believed that Doe had provided drugs, and the woman in the headscarf was likely smoking crack cocaine.  During this period, Chase walked out of sight of the CitiWatch camera, and Sergeant Schreven explained that he did not directly observe Chase receive controlled dangerous substances ("CDS") from or give CDS to either woman.

While the two women remained near the concrete wall, Chase stood and walked up the street, into a crosswalk, and stood near the middle of the road looking up and down the street before walking back to the concrete wall.  (ECF No. 35 at 4; DX 2 at 22:52–23:09; GX 1A at 26:25–27:35.)  Sergeant Schreven observed Chase's walk and noticed that he adjusted his pants and jacket pockets—which appeared to be full—in a manner that Sergeant Schreven associated with a "security check" performed by individuals carrying concealed firearms.  (ECF No. 35 at 5.)  Sergeant Schreven believed that Chase was likely carrying a concealed firearm in his left jacket pocket or his waistband below his left jacket pocket.[4]

---

[4] As defense counsel adduced during Sergeant Schreven's cross-examination testimony at the Motions Hearing, Sergeant Schreven stated in his sworn statement of probable cause in state court that he stopped Chase because he believed Chase was concealing an illegal firearm in his left jacket pocket.  At the Motions Hearing, however, Sergeant Schreven testified that he believed there was a concealed weapon in either Chase's left jacket pocket or his waistband.

When Chase returned to the wall, Doe withdrew several baggies from her purse, (DX 2 at 22:52–23:09; GX 1A at 27:43), which Sergeant Schreven knew to be consistent with packaging of Controlled Dangerous Substances ("CDS") sold in open-air drug markets. (ECF No. 35 at 5.) Chase remained seated on the wall as more individuals approached and the women stood nearby. (GX 1B at 00:00–5:48.) For much of this period, Doe continued to remove items from her purse and set them on the wall. (GX 1B at 5:48–5:55.) Nearly fifteen minutes later, a woman carrying a red polka dot "Save-a-lot" bag approached Chase and Doe, who were still sitting on the wall. (GX 1B at 22:15–22:41; ECF No. 35 at 6.) The newcomer withdrew her purse from her polka dot bag and placed it on the wall. (ECF No. 35 at 6; GX 1B at 22:40–22:46.) She appeared to withdraw cash from her purse. (GX 1B at 22:50.) Sergeant Schreven then observed Chase holding what appeared to be a white-capped, orange pill bottle and cash. (GX 1B at 26:19–26:32, 26:57–27:10; ECF No. 35 at 6.) Sergeant Schreven could not see the items inside the pill bottle, but he believed that their size was consistent with CDS in the form of pills.

Based on these observations, Sergeant Schreven believed that he had watched Chase conduct a hand-to-hand CDS transaction, and he assembled officers to respond to the scene with the intent of locating Chase. (ECF No. 35 at 7.) Sergeant Schreven traveled to the 2000 block of Maryland Avenue in an unmarked police vehicle with two other officers—Officer Wallace, who was a passenger in the vehicle, and Officer Craig, who was driving the vehicle. Sergeant Schreven's body-worn-camera footage makes clear that the officers responded with the intent to stop Chase, as the officers said "is that him?" before stopping him. (GX 2 at 1:00–1:04.) The interaction began when Sergeant Schreven said, "hey bud come here" and

grabbed the back of Chase's jacket before holding both his arms behind his back. (GX 2 at 1:05–1:10.) Officer Wallace approached Chase and explained "everything's already video recorded, the reason for the stop is a CDS investigation, ok?" (GX 2 at 1:08–1:13.) Officer Craig then approached Chase's front. (GX 2 at 1:08–1:13.)

As Sergeant Schreven and Officer Wallace handcuffed Chase's arms behind his back, Officer Craig immediately reached into the front left pocket of Chase's jacket without first patting down the area.[5] (GX 2 at 1:15–1:28; DX 4 at 1:04–1:07.) Officer Craig held Chase's jacket pocket open and removed two orange pill bottles and a charger, which he placed on the back of the officers' unmarked police vehicle. (DX 4 at 1:07–1:27.) Officer Wallace informed Chase, "right now you're just being detained, ok." (GX 2 at 1:28–1:32.) Officer Craig continued to search the left side of Chase's person, including his left jacket pocket and his left pants pocket. At the same time, Officer Wallace searched the right side of Chase's person, particularly the right pocket of his pants. Officer Wallace felt the items in Chase's pants pocket over top of Chase's clothing.

Officer Craig removed a phone case from Chase's pocket, and removed a Maryland ID card from the phone case before reaching into Chase's left pants pocket. (DX 4 at 1:27–1:40.) Officer Craig then removed a phone from Chase's left pants pocket, and asked his permission before hanging up the phone, which was on an active call. (DX 4 at 1:38–1:58.) Officer Craig continued removing items from Chase's left pants pocket, including a wad of cash and a lighter. (DX 4 at 1:55–2:00.) Officer Craig conducted this portion of the search by feeling

---

[5] The Court refers to the pockets according to their position relative to Chase. Thus, Chase's left jacket pocket is on the left side of his body, which would be to the right for any individual facing Chase.

the front outside portion of Defendant's pants pocket with his left hand while reaching inside Chase's pocket with his right hand.  (DX 4 at 1:55–2:00.)  Officer Craig returned the cash to Chase's pants pocket before feeling the front of his jacket again.  He then unzipped Chase's jacket to reach inside his jacket.  (DX 4 at 2:20–2:26.)  During this period, Officer Wallace recovered small white pellets wrapped in plastic from the right pocket of Chase's pants.  He removed the pellets and placed them on top of the unmarked police vehicle with the pill bottles and other items that Officer Craig had removed from Chase's left jacket pocket.

Around this time, the audio of Officer Craig's body-worn camera captured two officers saying, "he's got a gun on him" and "Yeah, he's got a gun right here."  (DX 4 at 2:23–2:25.) This entire process took no more than one minute from the time Officer Craig reached his hand into Chase's left jacket pocket.[6]  Officer Craig then felt over top the front of Chase's pants before reaching inside his pants to remove a gun.  (DX 4 at 2:25–2:31.)  After finding the gun, the officers continued to search Chase's pants, and instructed him to stop touching his pants.  (GX 2 2:38–3:15.)  When Chase asked if he could call someone, the officers informed him that he was under arrest.  (DX 4 at 3:23–3:28.)  The officers then questioned Chase about his name, his address, his probation status, why he has multiple IDs in his pocket, and his date of birth.  They did not at any point read Chase his *Miranda* rights, even after informing him he was under arrest and searching him again before placing him in a police vehicle.  (GX 2 at 8:00–9:37.)

---

[6] After reviewing the officers' body-worn camera footage, (GX 2; DX 4), the Court made a factual finding on the record that the entire process of the frisk—beginning when Craig placed his hand in Chase's left jacket pocket and ending when officers found the gun—took not much longer than one minute.

The officers ultimately removed two plastic bags full of capsules, several pill bottles, and the firearm from Chase's person.  (DX 4 at 2:31–3:12.)  The pills and capsules were subsequently determined to be gabapentin, Adderall, clonidine, and cocaine base.  (ECF No. 35 at 7; ECF No. 32 at 3.)  Based on these items and the firearm, Chase was charged in the three-Count Superseding Indictment with possession with intent to distribute controlled substances, in violation of 21 U.S.C. § 841 (Count One); possession of firearm and ammunition by a prohibited person, in violation of 18 U.S.C. § 922(g)(1) (Count Two); and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count Three).  (ECF No. 37 at 1–3.)  On January 18, 2025, through defense counsel, Chase filed a Motion to Suppress Property (ECF No. 32) discovered during this interaction.  The Government responded in Opposition (ECF No. 35), and Chase replied (ECF No. 41).  On March 25, 2025, the Court heard oral argument from the parties regarding Defendant's Motion, and denied Defendant's Motion (ECF No. 32) on the record.  This Memorandum Opinion further explains the reasons for that denial.

## STANDARD OF REVIEW

The Fourth Amendment of the U.S. Constitution protects individuals' right to "be secure in their persons, houses, papers, and effects against unreasonable searches and seizures[.]"  U.S. CONST. amend. IV.  The Supreme Court has recognized, however, that a police officer may stop, briefly detain, and question a person without violating the Fourth Amendment "when the officer has a reasonable, articulable suspicion that criminal activity is afoot."  *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000); *see also Terry v. Ohio*, 392 U.S. 1, 30 (1968); *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

7

"The government bears the burden of proof in justifying a warrantless search or seizure." *United States v. Ingram*, 597 F. App'x 151, 152 (4th Cir. 2015) (quoting *United States v. McGee*, 736 F.3d 263, 269 (4th Cir. 2013) *cert. denied* 134 S. Ct. 1572 (2014)). "[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177-78 n.14 (1974) (burden of proof for voluntariness of consent to search is by preponderance of the evidence); *see also*, *e.g., Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986) (preponderance of the evidence burden regarding waiver of Miranda rights); *Nix v. Williams*, 467 U.S. 431, 444-45 n.5 (1984) (preponderance of the evidence burden regarding inevitable discovery of evidence obtained by unlawful means); *Lego v. Twomey*, 404 U.S. 477, 489 (1972) (preponderance of the evidence burden regarding voluntariness of confession).

## ANALYSIS

In his Motion and related filings, Chase raises two arguments for suppression. First, he challenges the existence of reasonable suspicion or probable cause to justify the seizure of his person. *See* (ECF No. 32). Second, he argues that Officer Craig unconstitutionally exceeded the scope of a *Terry* frisk by reaching immediately into his left jacket pocket before conducting a pat-down over top his clothing. *See* (ECF No. 41). The Court addresses each argument in turn.

### I.     Reasonable Suspicion Existed to Stop and Frisk Chase

Chase contends that the CitiWatch footage could not provide probable cause or reasonable suspicion to stop his person. (ECF No. 32 at 5.) He argues that BPD officers did not observe him directly engage in any hand-to-hand CDS transactions, and Sergeant Schreven

acknowledged during his testimony that the apparent CDS transactions between Jane Doe and other individuals were not relevant to the existence of probable cause to arrest Chase. Moreover, he notes that the officers relied solely on the CitiWatch footage and did not conduct further surveillance. (*Id.*) Finally, Chase asserts that no firearm was brandished or visible. (*Id.*) Chase emphasizes that the facts reasonably known to officers at the time of the stop could not justify the detention. (*Id.* at 6.) Therefore, Chase contends that the property seized from his person must be suppressed as fruits of an illegal detention pursuant to *Wong Sun v. United States*, 371 U.S. 471, 484 (1963). (*Id.*)

In its briefing in opposition, the Government contends that the initial stop was justified by reasonable suspicion, which developed into probable cause to support arrest such that the property seized was obtained through a valid search incident to arrest. (ECF No. 35 at 9.) The Government argued that Sergeant Schreven's observations of Chase through the CitiWatch system provided reasonable suspicion to justify the stop because: (1) Chase was in the 2000 block of Maryland Avenue, which is known to law enforcement as high crime area; (2) Sergeant Schreven observed multiple interactions consistent with hand-to-hand drug transactions; (3) Chase exhibited characteristics of someone conducting a "security check" while carrying a concealed firearm; and (4) each of these factors occurred over a period of several minutes as Sergeant Schreven observed Chase via CitiWatch. (*Id.* at 10, 11.) The Government argues that the officers were entitled to rely on their specialized knowledge of the area and of conduct consistent with concealed weapons and hand-to-hand drug transactions. (*Id.* at 8.) The Government initially asserted that the officers' reasonable suspicion developed into probable cause for arrest when they recovered orange pill bottles—

one of which matched the appearance of the bottle Sergeant Schreven observed Chase holding on camera—from the front pocket of Chase's jacket. (*Id.* at 11.)

At the Motions Hearing, however, the Government raised the alternative argument that the entire stop was justified by probable cause based on the CitiWatch footage. The Government emphasized that Sergeant Schreven testified that he believed he had probable cause to arrest Chase because he observed him (1) conduct multiple security checks in a high crime area; (2) handle a pill bottle and cash; and (3) receive cash from a woman who approached him carrying a polka dot bag. For this reason, the Government argued that the entire search was a valid search incident to lawful arrest, and no property seized from Chase during that search should be suppressed. (*Id.*)

To justify an investigative stop under *Terry*, the Government bears the burden to establish by a preponderance of the evidence that officers had reasonable articulable suspicion of criminal activity. *See, e.g.*, *Terry*, 382 U.S. at 30. The existence of "reasonable suspicion" depends on the totality of the circumstances and reasonable inferences drawn by police officers based on information known to them. *See United States v. Arvizu*, 534 U.S. 226 (2002); *United States v. Brown*, 398 F. App'x 865, 867 (4th Cir. 2010) (citing *United States v. Sokolow*, 490 U.S. 1, 8 (1989)). The U.S. Court of Appeals for the Fourth Circuit has noted that the determination of reasonable suspicion is a "common-sensical proposition . . . crediting the practical experience of officers who observe on a daily basis what transpires on the street." *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993). For this reason, courts owe due deference to officers' observations based on their experience, training, and knowledge. *United*

*States v. Foreman*, 369 F.3d 776, 782 (4th Cir. 2004); *see also Arzivu*, 534 U.S. at 273; *United States v. Johnson*, 599 F.3d 339, 343 (4th Cir. 2010) (collecting cases).

The Fourth Circuit has recognized several factors that may contribute to the existence of reasonable suspicion, including: presence in a high crime area; consistent, close proximity to drug transactions; suspected hand-to-hand drug transactions; and conduct consistent with a "security check" of a concealed weapon. *See United States v. Christmas*, 222 F.3d 141 (4th Cir. 2000) (recognizing as relevant to reasonable suspicion an individual's presence in high crime area); *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004) (recognizing as relevant to reasonable suspicion commonsense judgment that people in consistent proximity to drug transactions are likely involved); *Johnson*, 599 F.3d at 340, 345 (recognizing participation in suspected hand-to-hand drug transactions as relevant to reasonable suspicion); *United States v. Foster*, 824 F.3d 84, 94 (4th Cir. 2016) (recognizing security check as relevant to reasonable suspicion). For example, in *United States v. Johnson*, 599 F.3d 339 (4th Cir. 2010), the Fourth Circuit concluded that an officer had reasonable suspicion for a stop after he observed the defendant in a known open-air drug market engage in three instances of hand-to-hand contact with three men in rapid succession and mill around the street before returning to the area where the hand-to-hand contact occurred. *Id.* at 341, 345.

In this case, officers certainly had reasonable suspicion to conduct an investigatory stop of Chase's person. Chase was in the 2000 block of Maryland Avenue, an area known to law enforcement for frequent drug transactions. *See Lender*, 985 F.2d at 154 (presence in high crime area can contribute to reasonable suspicion). Additionally, officers observed Chase sit for an extended period in close proximity to Jane Doe, who—as Chase acknowledges, *see* (ECF

No. 41 at 1)—engaged in activity suggestive of drug transactions.  *See Perkins*, 363 F.3d at 321 (explaining commonsense judgment that people in consistent proximity to drug transactions are likely involved).  Moreover, Chase's own actions were consistent with hand-to-hand drug transactions: officers observed him handling a pill bottle; holding cash; receiving cash from one individual; and conversing with multiple different people who approached.  The officers' observation that Chase's manner of walking and adjusting his pants was consistent with a "security check" further supported reasonable suspicion.  *See Foster*, 824 F.3d at 94 ("A security check can contribute to a finding of reasonable suspicion that the suspect was engaged in criminal activity.").  These observations justified a *Terry* stop and a *Terry* frisk of Chase's person.

The officers' initial observations, however, likely did not support probable cause to conduct a warrantless *arrest* of Chase.  *See Brinegar v. United States*, 338 U.S. 160, 175–78 (1949) (explaining probable cause "is a reasonable ground for belief of guilt" but requires more than "mere suspicion").  Both this Court and the Fourth Circuit have repeatedly recognized that officers' observation of suspected hand-to-hand drug transactions, together with other circumstances such as informant testimony or a security check, may create reasonable suspicion.  *See, e.g.*, *United States v. Ward*, 465 F. App'x 260, 262 (4th Cir. 2012) (holding reliable informant tips, discussions with defendant's customers, and observation of hand-to-hand drug transaction as a whole created *reasonable suspicion* of criminal activity); *Foster v. Vignola*, Civ. No. GLR-13-3758, 2015 WL 4615905, at *5 (D. Md. July 30, 2015) (explaining observation of suspected hand-to-hand drug transaction provided *reasonable suspicion* to stop defendant's vehicle and probable cause resulted after defendant fled police during the stop).  Even where

officers (1) observed hand-to-hand drug transactions; (2) spoke to a defendant's customers, *and* (3) heard from a confidential informant that a defendant was selling drugs, the Fourth Circuit has not suggested that probable cause existed. *See Ward*, 435 F. App'x at 262; *see also Johnson*, 599 F.3d at 340 (explaining officers had reasonable suspicion based on observation of multiple hand-to-hand exchanges in open air drug market and "reasonable suspicion ripened into probable cause" when defendant threw a heroin gelcap out of sight).

In this case, Sergeant Schreven explained that he decided to approach Chase based on one suspected hand-to-hand transaction directly involving Chase,[7] two security checks, and Chase's presence in a high crime area. These facts likely do not rise to the level of probable cause.[8] Undoubtedly, however, these facts created *reasonable articulable suspicion* to conduct an investigative stop of Chase based on suspicion of his involvement in drug trafficking activity *and* reasonable articulable suspicion to frisk Chase based on suspicion that he was armed and dangerous. *See Arizona v. Johnson*, 555 U.S. 323, 326–27 (2009) (explaining frisk is justified when officers have reasonable articulable suspicion an individual is armed and dangerous); *see also Foster*, 824 F.3d at 94 (holding security check relevant to reasonable suspicion inquiry); *United States v. Myers*, 986 F.3d 453, 456 (4th Cir. 2021) (recognizing "drugs and guns all too often go hand in hand" (quoting *United States v. Lomax*, 293 F.3d 701, 706 (4th Cir. 2002)).

---

[7] Sergeant Schreven testified that his observation of suspected drug transactions between Jane Doe and other individuals are not relevant to the determination of probable cause to arrest Chase.

[8] Sergeant Schreven testified at the Motions Hearing that he believed at the time that he had probable cause to arrest Chase, and, at the time, he thought the entire stop was a search incident to a lawful arrest based on probable cause. This is somewhat inconsistent with his body-worn camera footage, in which an officer informs Chase that "everything's already video recorded, the reason for the stop is a CDS investigation, ok?," and "right now you're just being detained, ok." (GX 2 at 1:08–1:13; 1:28–1:32.) This is also contradicted in the Government's initial briefing, in which the Government asserted that the stop occurred based on reasonable suspicion that ripened into probable cause upon the discovery of pill bottles in Chase's pocket. (ECF No. 35 at 11.)

Specifically, Chase's two security checks while he was in a high crime area provided sufficient reasonable suspicion that he was armed, which justified a *Terry* frisk to protect officer safety during the investigative stop of his person.[9] *See Terry v. Ohio*, 392 U.S. 1, 23 (1968) (explaining officer safety justification for frisk); *see also United States v. Robinson*, 846 F.3d 694, 696 (4th Cir. 2017) ("The Fourth Amendment does not 'require . . . police officers [to] take unnecessary risks in the performance of their duties.'" (alterations in original) (quoting *Terry*, 392 U.S. at 23)). Within approximately one minute of this frisk, officers recovered the gun from Chase's person. The discovery of a gun on an individual contributes to probable cause for a warrantless arrest, thereby justifying a search incident to a constitutional arrest. *See United States v. Humphries*, 372 F.3d 653, 656, 657–58 (4th Cir. 2004) (discussing probable cause based on law enforcement observations related to drugs and guns); *Birchfield v. North Dakota*, 579 U.S. 438, 458–61 (2016) (explaining history and scope of search-incident-to-arrest doctrine).

## II. Scope of Frisk

Chase argues that even if the original stop was valid based on reasonable suspicion—which he does not concede—the officers exceed the permissible scope of a *Terry* frisk by immediately reaching into his left jacket pocket without first conducting a pat-down of his outer clothing. (ECF No. 41 at 2.) Chase emphasizes that Officer Craig immediately reached his hand into his left jacket pocket at the beginning of the frisk. (*Id.*) For this reason, Chase asserts that all property seized during the subsequent search of his person must be suppressed under the fruit of the poisonous tree doctrine. (*Id.*) In response, the Government argues that

---

[9] The officers handcuffed Chase shortly into the course of the stop. Placing a subject in handcuffs during a stop-and-frisk in a crowded public area is constitutional and does not exceed the limits of a *Terry* stop. *United States v. Gist-Davis*, 41 F.4th 259, 265 (4th Cir. 2022).

Officer Craig's conduct is not relevant to suppression because the officers would have located the firearm and drugs on Chase's person during the frisk regardless.

The Supreme Court has held that "to proceed from a stop to a frisk, the police officer must . . . harbor a reasonable suspicion that the person subjected to the frisk is armed and dangerous." *Johnson*, 555 U.S. at 326–27; *see also Foster*, 824 F.3d at 89 ("Even if an investigatory stop is justified by reasonable suspicion, a subsequent frisk of a suspect for weapons is not necessarily permissible."). The scope of a *Terry* frisk is not the same as the scope of a search, however. "The search for weapons approved in *Terry* consisted solely of a limited patting of the outer clothing of the suspect for concealed objects which might be used as instruments of assault." *Sibron v. New York*, 392 U.S. 40, 65 (1968); *see also United States v. Mayo*, 361 F. 3d 802, 805 (4th Cir. 2004) (noting that the officer may frisk the person *by patting his outer clothing* (emphasis added)). This limitation reflects that "[a]n officer is not justified in conducting a general exploratory search for evidence under the guise of a stop-and-frisk." *United States v. Swann*, 149 F.3d 271, 274 (4th Cir. 1998). Even so, if in the course of validly frisking for weapons a police officer "feels an object whose contour or mass makes its identity immediately apparent as contraband, [that object] may be lawfully seized." *United States v. Gist-Davis*, 41 F.4th 259, 264 (4th Cir. 2022) (quoting *United States v. Hernandez-Mendez*, 626 F.3d 203, 213 (4th Cir. 2010)).

In this case, the frisk of Chase's person was justified, but Officer Craig exceeded the scope of a constitutional frisk with respect to initially placing his hands inside the front left pocket of Chase's jacket and seizing narcotics. Sergeant Schreven's observation of Chase's proximity to potential hand-to-hand drug transactions in an area known for drug crimes *and*

Chase's alleged "security checks" created reasonable suspicion that Chase was armed and dangerous. *See United States v. Wright*, 31 F. App'x 211, 213 (4th Cir. 2002) (upholding frisk as constitutional where officers observed bulge in shape of handgun in defendant's pocket and defendant was in high crime area); *Foster*, 824 F.3d at 94 (holding security check relevant to reasonable suspicion inquiry); *Myers*, 986 F.3d at 456 (4th Cir. 2021) (explaining frequent association between drugs and guns). Multiple officers, including Officer Craig and Officer Wallace, participated in the frisk of Chase's person. The body-worn camera footage makes clear that during that frisk, Officer Craig initially exceeded the constitutional bounds of a *Terry* frisk by immediately reaching into Chase's left jacket pocket without first conducting a pat-down of the area. That is, rather than waiting for the development of probable cause—which provides constitutional justification for a full search, including reaching directly into an individual's pockets—Officer Craig placed his hand directly into Chase's pocket during the course of an ongoing frisk.

As explained on the record at the Motions Hearing, the Court determines as a finding of fact that Officer Craig reached into Chase's pocket approximately one minute before he removed the gun from Chase's waistband. The Fourth Circuit has explained that the length of a frisk and the number of officers involved are not relevant to its validity, which depends only on its intrusiveness. *United States v. Meyers*, 760 F. App'x 181, 186 n.1 (4th Cir. 2019). In this case, the Court notes the length of time between Officer Craig reaching into Chase's pocket and his subsequent discovery of the gun not to demonstrate the validity of the frisk but to make clear that the pill bottles, plastic bags containing drugs, and the gun were

recovered during the same initial search or frisk of Chase's person, which lasted not much more than one minute.

Immediately reaching into a subject's pocket during a frisk is unreasonable because it goes beyond the scope of *Terry*. Both the Fourth Circuit and the Supreme Court have recognized that, during a *Terry* stop-and-frisk, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *United States v. Meyers*, 760 F. App'x 181, 186 (4th Cir. 2019) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). In *Sibron v. New York*, 392 U.S. 40 (1968), the Supreme Court explained that even where officers reasonably suspect an individual subject to a *Terry* frisk is armed and dangerous, reaching directly into the individual's pocket without an over-the-clothes pat-down violates the Fourth Amendment because such conduct is "not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception—the protection of the officer by disarming a potentially dangerous man." *Id.* at 65. The Second and Tenth Circuits also have held that reaching directly into an individual's pocket without first conducting pat-down unconstitutionally exceeds the scope of a *Terry* frisk. *See United States v. Santillanes*, 848 F.2d 1103, 1109 (10th Cir. 1988); *United States v. Casado*, 303 F.3d 440, 448–49 (2d Cir. 2002). Thus, Officer Craig exceeded the scope of a *Terry* frisk when he immediately reached into Chase's jacket pocket without a pat-down.

## III. The Inevitable Discovery Doctrine

Where evidence is seized based on unconstitutional conduct by law enforcement, the exclusionary rule may apply to preclude introduction of the evidence at trial. *See Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963). The Supreme Court has recognized that "the

exclusionary rule encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure, and, relevant here, 'evidence later discovered and found to be derivative of an illegality, the so-called 'fruit of the poisonous tree.'" *Utah v. Strieff*, 579 U.S. 232, 237 (2016) (citation omitted). Typically, evidence derivative of an illegality is excluded under the fruit of the poisonous tree doctrine where there is a "causal relationship between the unconstitutional act and the discovery of [such] evidence." *Id.* This reflects that "the rationale of the exclusionary rule . . . is the deterrence of police misconduct," and useful evidence should not be excluded unless police misconduct caused its discovery. *United States v. Thomas*, 955 F.2d 207, 209 (4th Cir. 1992).

Based on this causal relationship requirement, courts have recognized various exceptions to the exclusionary rule. *See Strieff*, 579 U.S. at 238. As one such exception, "the inevitable discovery doctrine allows for the admission of evidence that would have been discovered even without the unconstitutional source." *Id.* at 238; *see also Nix v. Williams*, 467 U.S. 431, 443–44 (1984). The Fourth Circuit has recognized that "the premise of the inevitable discovery doctrine is that the illegal search played no real part in discovery of incriminating evidence." *United States v. Whitehorn*, 813 F.2d 646 (4th Cir. 1987). "Stated otherwise, where it appears that evidence 'inevitably would have been discovered by lawful means,' the deterrence rationale of the exclusionary rule has 'so little basis' that the rule should not be applied." *Id.* at 650 (quoting *Nix*, 467 U.S. at 444). As Judge Hollander of this Court has recognized, however, "mere speculation that evidence could have been discovered is not sufficient." *United States v. Brandon*, Crim. No. ELH-22-0239, 2023 WL 6961937, at *34 (D. Md. Oct. 19, 2023). On a motion to suppress, the Government bears the burden to raise

inevitable discovery and demonstrate by a preponderance of the evidence that the evidence inevitably would have been discovered even absent the unconstitutional conduct. *See United States v. Seay*, 944 F.3d 220, 223 (4th Cir. 2019); *United States v. Ferebee*, 957 F.3d 406, 417 n.2 (4th Cir. 2020).

In this case, the Government asserts that even assuming Officer Craig exceeded the scope of a lawful frisk under *Terry*, the property seized from Chase would inevitably have been discovered during the frisk. The body-worn camera footage makes clear that both Officer Craig *and* Officer Wallace participated in frisking Chase. While Officer Craig conducted a frisk of the left side of Chase's body and his waistband, Officer Wallace simultaneously frisked the right side of Chase's body. Officer Wallace did not exceed the scope of a frisk because he conducted a proper pat down of Chase's outer clothing before removing drug contraband wrapped in plastic bags from Chase's right pants pocket. Once Officer Wallace discovered drugs in Chase's right pants pocket, the officers had probable cause to arrest Chase and conduct a lawful search incident to arrest.

Thus, the inevitable discovery doctrine applies to prevent exclusion here. Even absent Officer Craig's unlawful search of Chase's pocket during a *Terry* frisk, the firearm and drugs in Chase's pockets would have been discovered during a lawful search incident to arrest based on probable cause developed from Officer Wallace's discovery of drugs on Chase's person. Moreover, even if Officer Wallace had not uncovered drugs on Chase's person such that probable cause arose, he would have continued to frisk Chase lawfully until the officers discovered the firearm in his waistband. *See Meyers*, 760 F. App'x at 186 (explaining that where officers do not find a weapon in their justified frisk of one part of the defendant's person, it

is reasonable for them to continue the frisk). The frisk in this case was justified by reasonable suspicion that Chase was armed. Officer Wallace, who frisked Chase at the same time as Officer Craig, inevitably would have discovered the drugs and gun on Chase's person either during his lawful frisk or upon a lawful search incident to arrest based on probable cause derived from the drugs he felt in Chase's pocket. Because both officers frisked simultaneously, the discovery of the evidence was inevitable beyond mere speculation.

Accordingly, the inevitable discovery doctrine applies such that the property should not be suppressed in this case. Defendant's Motion to Suppress Property (ECF No. 32) is DENIED.

## CONCLUSION

For the foregoing reasons and the reasons stated on the record at the March 25, 2025, Motions Hearing, Defendant's Motion to Suppress Property (ECF No. 32) is DENIED.

A separate Order follows.

/s/
_____
Richard D. Bennett
United States Senior District Judge

Dated: March 27, 2025